UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SPLITROCK PROPERTIES, INC., a South Dakota corporation, | ) ) ) | CIV. 09-4075-KES |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | ORDER STAYING CASE AND REFERRING SEVERAL ISSUES TO FEDERAL |
| SPRINT COMMUNICATIONS COMPANY LIMITED PARTNERSHIP, | ) ) ) | COMMUNICATIONS COMMISSION |
| Defendant. | ) ) | |

This case is one of several similar cases pending in the District of South

Dakota.  This court has stayed four of these cases and referred specific issues

to the Federal Communications Commission (FCC) pursuant to the primary

jurisdiction doctrine.  Although neither party in the present case has moved

the court to stay the action and refer specific issues to the FCC, the court

ordered the parties to address whether this case should be stayed and referred

to the FCC.  Plaintiff, Splitrock Properties, Inc. (Splitrock), asserts that referral

is not appropriate at this time.  Defendant, Sprint Communications Company

Limited Partnership (Sprint), also opposes referral, at least until fact discovery

is complete on the central tariff question.  Despite the opposition of the parties,

the court finds that referral of certain issues to the FCC is called for under the

primary jurisdiction doctrine.

**BACKGROUND**

A.      **History of the Present Case**

Splitrock brought this action to recover amounts allegedly due under its federal and state tariffs.  Splitrock, a local exchange carrier (LEC) based in South Dakota, alleges that it provided originating and terminating access services to Sprint, an interexchange carrier (IXC), and billed Sprint the applicable rates set forth in Splitrock's interstate access tariff filed with the FCC and intrastate access tariff filed with the South Dakota Public Utilities Commission (SDPUC).[1]  Splitrock alleges that Sprint has failed to pay the invoices and as a result owes Splitrock an amount to be proven at trial.  Splitrock filed suit against Sprint alleging breach of contract based on Sprint's failure to pay the access charges set out in Splitrock's federal and state tariffs, breach of implied contract, and unjust enrichment.

Sprint denies that it failed to pay switched access charges for services provided pursuant to Splitrock's tariffs on the ground that the services provided by Splitrock do not qualify as "switched access service," as that term

_____

[1] By way of background, there are two types of telecommunications providers, LECs and IXCs.  LECs provide the service and own the hardware that connects to individual customers in their local areas.  By contrast, IXCs, commonly known as long-distance carriers, own the hardware that connects different local carriers.  When an individual makes a long-distance telephone call, the call is originated on wires and facilities owned by the LEC serving the individual making the call and the call is terminated over wires and facilities owned by the LEC serving the individual receiving the call.  IXCs pay "originating" and "terminating" access charges to the LECs that serve individuals who initiate and receive long-distance calls, respectively.

is defined in Splitrock's tariffs.  Sprint's argument is based on the nature of the traffic at issue, which was originated by Sprint's long-distance customers and terminated to several companies that provide free telephone services such as conference calling, chat-line, and similar services.[2]  Sprint also alleges that Splitrock participated in a "traffic pumping scheme" with the free calling providers under which the free calling providers stimulated long-distance calls by offering various calling services to the public free of charge.  When a call was made from one of Sprint's long-distance customers to one of the free calling providers, Splitrock routed the call to or through equipment owned by the free calling provider or provided by Splitrock, charged Sprint the terminating switched access charge for delivering that call, and paid a portion of the charge to the free calling provider.  Sprint counterclaimed against Splitrock alleging violation of 47 U.S.C. § 203(c) (§ 203(c)), breach of federal tariff obligation and unreasonable practices in violation of 47 U.S.C. § 201(b) (§ 201(b)), breach of state tariff obligation, violation of Chapter 37-24 of the South Dakota Deceptive Trade Practices and Consumer Protection Act, negligent misrepresentation, fraudulent misrepresentation, unjust enrichment, and civil conspiracy.

Sprint moved to dismiss Splitrock's breach of implied contract and unjust enrichment claims.  This motion is still pending.

---

[2] The court will refer to these companies collectively as "free calling providers" or "conference calling companies."

## B.      Related Cases

This case is one of a number of cases pending in this court and in other courts involving a dispute between an LEC and an IXC regarding access charges associated with traffic delivered to free calling providers.  In each of these cases, an LEC claims that an IXC has wrongfully refused to pay terminating access charges for services performed pursuant to the LEC's tariffs and requests compensation under breach of contract, breach of implied contract, and/or unjust enrichment theories.  In each case, the IXC claims that the services provided were not covered by the applicable tariffs because the LEC did not "terminate" the calls and the free calling providers were not "end users" within the meaning of the tariffs.  Many of the IXCs also claim that the applicable LEC engaged in unlawful "traffic pumping."

The following cases are pending in the District of South Dakota: Northern Valley Communications, LLC v. MCI Communications Services, Inc. d/b/a Verizon Business Services, Civ. 07-1016-KES;[3] Sancom, Inc. v. Sprint Communications Co., Civ. 07-4107-KES; Sancom, Inc. v. Qwest Communications Co., Civ. 07-4147-KES; Northern Valley Communications, LLC v. Sprint Communications Co., Civ. 08-1003-KES; Splitrock Properties, Inc. v. Qwest Communications Co., Civ. 08-4172-KES; Sancom, Inc. v. AT&T

_____

[3] Northern Valley Communications, LLC v. MCI Communications Services, Inc., d/b/a Verizon Business Services, Civ. 07-1016 is consolidated with Sancom, Inc. v. MCI Communications Services, Inc., d/b/a Verizon Business Services, Civ. 07-4106.

Corp., Civ. 08-4211-KES; Northern Valley Communications L.L.C. v. AT&T Corp., Civ. 09-1003-CBK; and Northern Valley Communications L.L.C. v. Qwest Communications Co., Civ. 09-1004-CBK. Four of these cases have been stayed pending referral of several issues to the FCC, and motions to stay and refer are pending in two others.[4] And, based on information available to the court, there are nine similar cases pending in the United States District Court for the Southern District of Iowa, three cases pending in the United States District Court for the Northern District of Iowa, two cases pending in the United States District Court for the Southern District of New York, and one case each pending in the United States District Court for the District of Minnesota and the United States District Court for the Western District of Kentucky. Two of these courts have already stayed the action pending referral of several issues to the FCC. See Tekstar Commc'ns, Inc. v. Sprint Commc'ns Co., Civil No. 08-1130 (JNE/RLE), 2009 WL 2155930 (D. Minn. July 14, 2009); All Am. Tel. Co., Inc. v. AT&T, Inc., 07 Civ. 861 (WHP), Docket 88 (Jan. 19, 2010). Motions to stay and refer certain issues to the FCC are pending in several of the Southern District of Iowa cases.

## C. **Farmers**

---

[4] The court granted the plaintiff-LEC's motion to stay and refer issues to the FCC in Sancom v. Sprint, Civ. 07-4107-KES; Sancom v. Qwest, Civ. 07-4147-KES; Northern Valley v. Sprint, Civ. 08-1003-KES; and Sancom v. AT&T, Civ. 08-4211-KES. Similar motions are pending in Northern Valley v. AT&T, Civ. 09-1003-CBK; and Northern Valley v. Qwest, Civ. 09-1004-CBK.

Similar cases are also pending before various regulatory agencies, the most significant of which is Qwest Communications Corp. v. Farmers & Merchants Mutual Telephone Co. (Farmers), pending before the FCC. In Farmers, Qwest filed a complaint against Farmers and Merchants Mutual Telephone Company (Farmers), an incumbent LEC in Iowa, alleging that Farmers violated § 201(b) by earning an excessive rate of return as a result of its plan to increase dramatically the amount of terminating access traffic delivered to its exchange via agreements with conference calling companies. Qwest Commc'ns Corp. v. Farmers & Merchants Mutual Tel. Co., 2007 WL 2872754, 22 F.C.C.R. 17973, ¶ 1 (2007) (memorandum opinion and order) ("Farmers I"). Qwest also alleged that Farmers violated § 203(c) and § 201(b) by assessing switched access charges for services that were not switched access. Id. In October 2007, the FCC issued its memorandum opinion and order in Farmers I, ruling that Farmers violated § 201(b) by receiving an unlawfully high rate of return, but declining to award Qwest damages because Farmers' tariff was deemed lawful. Id. at ¶¶ 25-26. The FCC also rejected Qwest's argument that Farmers violated § 203(c) and § 201(b) by imposing terminating access charges on traffic that Farmers did not, in fact, terminate because, the FCC found, Farmers did "terminate" the traffic and the conference calling companies were "end users" as defined in Farmers' tariff. Id. at ¶¶ 30, 35. Qwest filed a petition to reconsider challenging various aspects of Farmers I.

In January 2008, the FCC granted in part Qwest's petition for partial reconsideration based on Qwest's assertions that Farmers falsely represented that the conference calling companies purchased interstate End User Access Service and paid the federal subscriber line charge and that Farmers backdated contract amendments and invoices to make it appear that the conference calling companies had been purchasing tariffed services. Qwest Commc'ns Corp. v. Farmers & Merchants Mutual Tel. Co., 2008 WL 246393, 22. F.C.C.R. 1615, ¶¶ 3, 6 (2008) (order on reconsideration). The FCC stated that it granted this motion for partial reconsideration because its finding in Farmers I that the conference calling companies were end users under Farmers' tariff was based on the above-mentioned representations made by Farmers. Id. at ¶ 6. The FCC ordered Farmers to produce all of the documents it produced in a related state utilities board proceeding, including documents relating to the decision to backdate contract amendments and invoices. Id. at ¶ 8.

In November 2009, the FCC issued its second order on reconsideration and ruled that the evidence brought to light pursuant to Qwest's petition for reconsideration warranted a change in its original ruling and compelled the conclusion that Farmers violated § 203(c) and § 201(b). Qwest Commc'ns Corp. v. Farmers & Merchants Mutual Tel. Co., No. EB-07-MD-001, 2009 WL 4073944, ¶ 1 (FCC Nov. 25, 2009) (second order on reconsideration) ("Farmers

II").[5]  The FCC found that the conference calling companies did not subscribe

to the services offered under Farmers' tariff, so they were neither "customers"

nor "end users" within the meaning of the tariff, and Farmers was not entitled

to charge Qwest switched access charges.  Id. at ¶ 10.  As a result, the FCC

found that Farmers' practice of charging Qwest access charges for the traffic

relating to the conference calling companies was unjust and unreasonable in

violation of § 201(b).  Id. at ¶ 26.  The FCC stated that the amount of any

damages would be calculated in a separate proceeding and suggested that its

ruling that the services Farmers provided did not qualify as "switched access

services" under Farmers' tariff did not mean that Farmers was entitled to no

compensation for these services.  Id. at ¶ 24 n.96.

## DISCUSSION

### I.    Referral to the FCC

"Primary jurisdiction is a common-law doctrine that is utilized to

coordinate judicial and administrative decision making."  Access Telecomms. v.

Southwestern Bell Tel. Co., 137 F.3d 605, 608 (8th Cir 1998).  The doctrine

"applies where a claim is originally cognizable in the courts, and comes into

play whenever enforcement of the claim requires the resolution of issues which,

under a regulatory scheme, have been placed within the special competence of

---

[5] Qwest did not challenge the FCC's finding in Farmers I that Farmers
terminated the traffic at issue, so Farmers II did not address this issue.
Farmers II, 2009 WL 4073944 at ¶ 6 n.29.

an administrative body." <u>Alpharma, Inc. v. Pennfield Oil Co.</u>, 411 F.3d 934, 938 (8th Cir. 2005) (internal quotation and citation omitted).

There is no fixed formula for deciding whether to apply the doctrine of primary jurisdiction. <u>Access Telecomms.</u>, 137 F.3d at 608 (citing <u>United States v. Western Pac. R.R. Co.</u>, 352, U.S. 59, 64 (1956)). Rather, the applicability of the doctrine in any given case depends on "whether the reasons for the doctrine are present and whether applying the doctrine will aid the purposes for which the doctrine was created." <u>Id.</u> The Eighth Circuit has identified two main reasons and purposes for the doctrine: first, and most common, "the use of agency expertise in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion," and second, the "promot[ion] of uniformity and consistency within the particular field of regulation." <u>Alpharma</u>, 411 F.3d at 938 (internal quotation omitted); <u>Access Telecomms.</u>, 137 F.3d at 608; <u>see also</u> <u>United States v. McDonnell Douglas Corp.</u>, 751 F.2d 220, 224 (8th Cir. 1984) ("The doctrine of primary jurisdiction . . . should seldom be invoked unless a factual question requires both expert consideration and uniformity of resolution." (internal quotation and citation omitted)). The Eighth Circuit warns that the doctrine "is to be 'invoked sparingly, as it often results in added expense and delay.' " <u>Alpharma</u>, 411 F.3d at 938 (quoting <u>Red Lake Band of Chippewa Indians v. Barlow</u>, 846 F.2d 474, 477 (8th Cir. 1988)).

The primary jurisdiction doctrine should be applied when the reasons for the doctrine are present even if the parties have not raised the issue. This is because "the doctrine exists for the proper distribution of power between judicial and administrative bodies and not for the convenience of the parties." Red Lake Band of Chippewa Indians, 84 F.2d at 476. When the primary jurisdiction doctrine applies, the "district court has discretion either to [stay the case and] retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." Access Telecomms., 137 F.3d at 609 (internal quotation and citation omitted, alteration in original).

In similar access charge cases, the court has referred three issues to the FCC: (1) whether the LEC is entitled to collect interstate switched access charges it has billed to the IXC for calls to numbers assigned to free calling providers; (2) in the event the services provided by the LEC to the IXC do not qualify as switched access service under the LEC's applicable interstate access tariff, determination of the proper classification of these services, whether such services are subject to federal tariffing requirements, and whether the LEC is entitled to obtain compensation for these services; and (3) in the event that the services provided by the LEC to the IXC do not qualify as switched access service under the LEC's applicable interstate access tariff, but the LEC is otherwise entitled to compensation for these services, determination of a reasonable rate for these services. The court finds that the reasons for applying the primary jurisdiction doctrine are present and that applying the

doctrine will aid the purposes for which the doctrine was created with respect to each issue.

## A.    Application of Tariff

The first issue the court considers referring to the FCC is the question of whether the service that Splitrock provided with respect to the free calling provider traffic at issue in this case qualifies as "switched access service" within the meaning of Splitrock's interstate access tariff.  This is essentially a tariff interpretation and enforcement question.  An action to enforce a tariff is properly brought before a court.  Access Telecomms., 137 F.3d at 609.  "Ordinarily, the construction of a tariff is a matter of law for the Court, being no different than the construction of any other written document."  United States v. Great N. Ry. Co., 337 F.2d 243, 246 (8th Cir. 1964).  But where " 'words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application,' . . . the issue should first go to the appropriate administrative agency."  Access Telecomms., 137 F.3d at 609 (quoting Western Pac., 352 U.S. at 66).  "The reason is plainly set forth: such a 'determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of [the regulated area] is indispensable, and such acquaintance is commonly to be found only in a body of experts.' " Western Pac., 352 U.S. at 66 (quoting Great N. Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 291 (1922)).

Where interpretation of the relevant tariff is straightforward, the primary jurisdiction doctrine does not apply. For example, in National Communications Ass'n, Inc. v. American Telephone & Telegraph Co., 46 F.3d 220, 223 (2d Cir. 1995), the threshold question of whether the plaintiff qualified for services under the tariff in turn depended on the factual question of whether the plaintiff had timely paid its bills. The Second Circuit reasoned that this issue could be resolved by the district court in a reasonable amount of time and did not require the FCC's policy experience or specialized knowledge. Id. Thus, the primary jurisdiction doctrine did not apply. Id. at 225.

In contrast, where the interpretation of the tariff requires interpretation of technical terms or specialized knowledge, referral under the primary jurisdiction doctrine is appropriate. For example, in Access Telecommunications, 137 F.3d at 609, the Eighth Circuit reasoned that the plaintiff's claim that the defendant carrier violated the plaintiff's tariff was properly referred to the FCC because application of the tariff would cause the court "to become embroiled in the technical aspects" of voice grade 7, the service at question, and the FCC had more expertise than the courts on the relevant issues of circuit designs, signal transmission, noise attenuation, and echo return loss.[6] Similarly, in United States v. Great Northern Railway Co.,

_____

[6] In Access Telecommunications, 137 F.3d at 609, the plaintiff's tariff claim required determination of the reasonableness of the defendant carrier's classification, a determination clearly within the FCC's authority under § 201(b). But the Eighth Circuit did not indicate that the propriety of the

337 F.2d at 246-47, the Eighth Circuit found that the phrase "transit privileges" in the relevant tariff "had a particular connotation in the rail transportation field, being a generic term requiring specific definition" and as such was a matter for primary determination by the applicable regulatory agency.[7]

Here, application of Splitrock's switched access tariff requires interpretation of words used in a technical sense and consideration of extrinsic evidence relating to topics within the expertise of the FCC. Under Splitrock's interstate access tariff,

> Switched Access Service, which is available to customers for their use in furnishing their services to end users, provides a two-point communications path between a customer designated premises and an end user's premises. . . . Switched Access Service provides for the ability to originate calls from an end user's premises to a customer designated premises, and to terminate calls from a customer designated premises to an end user's premises in the LATA where it is provided.

---

application of the primary jurisdiction doctrine depended on the presence of a reasonableness determination.

[7] In <u>United States v. Great Northern Railway Co.</u>, 337 F.2d at 247-48, the Eighth Circuit found that there was no need to refer the case to the Interstate Commerce Commission because the Commission had sufficiently defined the term in previous opinions to which the district court was required to give the greatest deference and weight.

National Exchange Carrier Association, Inc. (NECA) Tariff F.C.C. No. 5, § 6.1.[8]

Thus, in order for the services provided by Splitrock to qualify as "switched

access services," Splitrock must terminate the calls to an "end user's

premises." That is, the free calling providers must qualify as "end users."

Splitrock's interstate access tariff defines "end user" as "any customer of an

interstate or foreign telecommunications service that is not a carrier." Id. at

§ 2.6. "Customer," in turn, is defined as "any individual, partnership,

association, joint-stock company, trust, corporation, or governmental entity or

other entity which subscribes to the services offered under this tariff, including

both Interexchange Carriers (ICs) and End Users." Id. Splitrock's interstate

access tariff does not define "subscribe."

Determination of whether the free calling providers qualify as "end users"

under Splitrock's interstate access tariff would embroil the court in the

technical aspects of switched access service. In Farmers II, the FCC

interpreted the same tariff language at issue here. See Farmers II, 2009 WL

4073944 at ¶ 10 (setting out definitions of switched access service, end user,

and customer). Thus, the FCC's analysis in Farmers II sheds light on the

issues the court would be called on to resolve if it interpreted Splitrock's

interstate access tariff in this case. In Farmers II, the FCC considered the

---

[8] Splitrock is a concurring carrier in Alliance Communications
Cooperative, Inc. Tariff F.C.C. No. 1. See Docket 40 at 5. This tariff, in turn,
references the NECA Tariff F.C.C. No. 5 for its terms and conditions. See id.
Portions of the NECA Tariff F.C.C. No. 5 are available at Docket 40.

different connections Farmers provided to the conference calling companies versus the customers of its tariffed service. The FCC explained that "Farmers provided the conference calling companies with high-capacity DS3 trunks that fed into trunk-side connections, to a brand new 'soft switch' that Farmers purchased specifically to handle traffic bound for the conference calling companies." Id. at ¶ 13. Farmers used a Nortel DMS-10 circuit switch to serve all of its other customers. Id. The import and meaning of the different types of connections provided to different customers is an issue the FCC is more qualified than the court to consider. See Access Telecomms., 137 F.3d at 609 (explaining that the FCC has more expertise than the courts on matters such as circuit designs, signal transmissions, noise attenuation, and echo return loss).

The FCC also found that Farmers' agreements with the conference calling companies did not resemble traditional agreements for the provision of switched access services in that the agreements included exclusivity clauses and other unique terms not available under Farmers' tariff, required Farmers to pay the conference calling companies a given and unique sum per minute of traffic that Farmers delivered, and obligated each conference calling company to generate different amounts of traffic. Farmers II, 2009 WL 4073944 at ¶ 14. The FCC is uniquely qualified to compare the terms of an agreement between an LEC and a conference calling company with the terms of a traditional

agreement for the provision of tariffed access services because of the FCC's experience in the field.

Similarly, the FCC considered Farmers' failure to enter the conference calling companies' account information into its customer billing systems in accordance with its standard business practices for tariffed services, Farmers' failure to bill the conference calling companies for monthly services, Farmers' conduct throughout its business relationships with the conference calling companies, and the flow of money between Farmers and the conference calling companies. Id. at ¶¶ 12 n.49, 16, 17. An adequate appreciation of the relevance of these and other facts relating to an LEC's relationship with a conference calling company requires acquaintance with the many intricate facts of the normal practices and regulatory regime for switched access service.

Based on the FCC's analysis in Farmers II and the specific and technical meaning of the terms "switched access service," "end user," "customer," and "subscribe," the court finds that the issue of whether the services Splitrock provided to Sprint in this case qualify as "switched access services" under Splitrock's interstate tariff is a matter that requires the expertise of the FCC. "The courts, while retaining the final authority . . . should avail themselves of the aid implicit in the agency's superiority in gathering the relevant facts and in marshaling them into a meaningful pattern." United States v. Great N. Ry. Co., 337 F.2d at 246 (internal quotation and citation omitted).

Splitrock argues that the guidance provided by the FCC in <u>Farmers II</u> is sufficient to avail the court of the FCC's expertise so that referral of the issue of the application of Splitrock's tariff to the services at question in this case is unnecessary. Indeed, the Supreme Court has explained, "[c]ertainly there would be no need to refer the matter of [tariff] construction to the Commission if that body, in prior releases or opinions, has already construed the particular tariff at issue or has clarified the factors underlying it." <u>Western Pac.</u>, 352 U.S. at 69; <u>see also</u> <u>Great N. Ry. Co.</u>, 337 F.2d at 247-48 (explaining that where Interstate Commerce Commission had sufficiently defined "transit privileges" in previous opinions, the primary jurisdiction doctrine had been satisfied and there was no need to refer the case to the Commission).

Here, the court finds that <u>Farmers II</u> does not provide sufficient guidance to render referral unnecessary. <u>Farmers II</u> made clear that the application of the tariff is a fact-specific question. The type of connection and nature of the relationship between Splitrock and the free calling providers may differ from the facts of <u>Farmers II</u> so that the FCC's expertise is still necessary in this case. Further, many of the details of Farmers' billing practices and conduct were redacted from the FCC's opinion in <u>Farmers II</u>, and as a result, the opinion provides the court with the FCC's conclusion rather than the key facts supporting that conclusion. <u>See</u> <u>Farmers II</u>, 2009 WL 4073944 at ¶¶ 16, 18-20 (redacting confidential information regarding Farmers' billing practices, Farmers' efforts to backdate and amend its agreements, and Farmers'

17

relationship with the conference calling companies).  Thus, there remain

technical issues on which the FCC has not provided sufficient guidance.  As

the District of Minnesota explained, "the Court anticipates that review of the

myriad factors involved in the process of establishing tariffs will be significant

to gauging the scope of [plaintiff-LEC's] tariff."  Tekstar, 2009 WL 2155930, at

*2 (citing In re Establishing Just & Reasonable Rates for Local Exchange

Carriers, 2007 WL 2872755, 22 F.C.C.R. 17989, 17992-94 (2007) (notice of

proposed rulemaking); 47 C.F.R. § 61.26).  Thus, Farmers II does not obviate

the need for a primary jurisdiction referral of the tariff application issue in this

case.

Referral of the tariff application issue would also promote uniformity and

consistency within the particular field of regulation.  Because there are

currently about two dozen cases pending in federal courts across the country

involving the issue of whether the connection of long-distance calls through an

LEC's facilities to conference calling companies constitutes "switched access

service" under the applicable access tariffs, the court finds that the potential

for inconsistent or contradictory rulings on this issue is great.  Indeed, the FCC

and the Iowa Utilities Board (IUB) have reached partially inconsistent

conclusions on the tariff application issue.  As noted, the FCC reversed its

course between Farmers I and Farmers II and found that the conference calling

companies were not "end users" under Farmers' tariff.  The IUB considered

intrastate traffic involving many of the same parties as Farmers I and Farmers

II and found that the conference calling companies did not subscribe to the services offered in the LECs' intrastate access tariffs and therefore were not end users under the tariffs. In re Qwest Comm'cns Corp. v. Superior Tel. Coop., Docket No. FCU-07-2 at 24, 2009 WL 3052208, at *10 (Iowa Utils. Bd. Sept. 21, 2009) (final order). This finding is consistent with Farmers II. But the IUB also found that the calls to the conference calling companies did not terminate in the LECs' exchanges, which is inconsistent with Farmers I and Farmers II. Docket No. FCU-07-2 at 42, 2009 WL 3052208, at *19. The inconsistencies between Farmers I and Farmers II and the IUB's final order shows that the risk of inconsistent and contradictory rulings on the tariff application issue is great, even in light of the guidance provided by existing agency decisions. The purposes of the primary jurisdiction doctrine support referral of the tariff application issue.

### B.     Classification of Services

The second issue the court considers referring to the FCC is, if Splitrock's interstate access tariff does not apply to delivery of calls to the free calling providers, what is the proper legal classification of these services and is Splitrock entitled to compensation for them.[9] The FCC's expertise is necessary to determine whether Splitrock is entitled to compensation for services not

---

[9] Splitrock objects to referral of the tariff application issue, but agrees that if the court must consider whether the services provided by Splitrock are compensable even though they do not fall under Splitrock's tariff, then the FCC is the appropriate forum to determine this issue.

covered by its tariffs. The FCC suggested in <u>Farmers II</u> that an LEC may obtain compensation from an IXC to which it provided services even though the services did not qualify as "switched access services" under the LEC's access tariff. In Footnote 96, the FCC stated,

> This is not to say that Farmers is precluded from receiving any compensation at all for the services it has provided to Qwest. <u>See, e.g.</u>, <u>New Valley Corp. v. Pacific Bell</u>, Memorandum Opinion and Order, 15 FCC Rcd 5128, 5133, ¶ 12 (2000) (fact that a carrier's tariff did not include rates or terms governing the service provided did not mean that the customer was entitled to damages equal to the full amount billed; rather "where, as here, the carrier had no other reasonable opportunity to obtain compensation for services rendered . . . a proper measure of the damages suffered by a customer as a consequence of a carrier's unjust and unreasonable rate is the difference between the unlawful rate the customer paid and a just and reasonable rate"), <u>aff'g</u> <u>New Valley Corp. v. Pacific Bell</u>, Memorandum Opinion and Order, 8 FCC Rcd 8126, 8127, ¶ 8 (Com. Car. Bur. 1993) (finding no basis in the Supreme Court's "<u>Maislin</u> [decision] or any other court or Commission decision for the conclusion that a customer may be exempt from paying for services provided by a carrier if those services were not properly encompassed by the carrier's tariff"). <u>See also</u> <u>America's Choice, Inc. v. LCI Internat'l Telecom Corp.</u>, Memorandum Opinion and Order, 11 FCC Rcd 22494, 22504, ¶ 24 (Com. Car. Bur. 1996) (holding that "a purchaser of telecommunications services is not absolved from paying for services rendered solely because the services furnished were not properly tariffed").

<u>Farmers II</u>, 2009 WL 4073944 at ¶ 24 n.96. The FCC has not indicated the basis for compensation of the LEC, whether the LEC's termination of calls to the conference calling companies was subject to federal tariffing requirements, or how such calls should be classified within the regulatory scheme. Given the FCC's role in regulating the environment in which LECs provide tariffed access services, <u>see</u> <u>In re Establishing Just & Reasonable Rates for Local Exchange</u>

Carriers, 22 F.C.C.R. 17989 at ¶ 6 (explaining alternative means for rate-of-return LECs to file interstate access tariffs under FCC rules), and the uncertainty created by Footnote 96, these issues are properly determined by the FCC.

Referral of the issue of the classification of the services provided by Splitrock also promotes uniformity and consistency. There is disagreement among courts in this district over whether an LEC may recover under an unjust enrichment theory. Compare Sancom, Inc. v. Qwest Comm'cns Corp., 643 F. Supp. 2d 1117, 1125-27 (D.S.D. 2009) (finding unjust enrichment claim to be barred by the filed rate doctrine) and Splitrock Props., Inc. v. Qwest Comm'cns Corp., Civ. 08-4172-KES, Docket 28 at 3 (D.S.D. Aug. 28, 2009) (same) with Northern Valley Commc'ns, LLC v. Qwest Commc'ns Corp., 659 F. Supp. 2d 1062, 1070 (D.S.D. 2009) (finding that filed rate doctrine does not defeat unjust enrichment claim where it is alleged that tariff does not apply). While the court does not refer this legal question to the FCC, the inconsistent rulings show the need for clarification by the FCC on whether services provided by an LEC with respect to free calling provider traffic are subject to tariff requirements, where these services fall into the regulatory regime, and how an LEC may obtain compensation for these services outside of its tariffs. The purposes of the primary jurisdiction doctrine support referral of the service classification issue.

**C.    Reasonable Rate**

The third question the court considers referring to the FCC is, if Splitrock's interstate access tariff does not apply to the services at issue, but Splitrock is entitled to compensation for these services, what is the reasonable rate.  It is well established that the FCC is specially positioned to determine the reasonableness of rates.  See, e.g., Qwest Corp. v. Scott, 380 F.3d 367, 375 (8th Cir. 2004) (stating that regulating agency has authority to determine reasonableness of rates).  Thus, if Splitrock is entitled to compensation for the services it provided to Sprint outside of its tariffed rate, the FCC has the expertise and experience to determine the appropriate rate.  See Access Telecomms., 137 F.3d at 609 (stating that FCC has statutory authority to make reasonableness determinations).  Given the posture of Farmers II, the court finds that the purposes of the primary jurisdiction doctrine are best served by allowing the FCC to determine whether, under what basis, and at what rate an LEC is entitled to be compensated for delivering long-distance traffic to free calling providers on behalf of IXCs like Sprint where the service does not fall under the applicable switched access tariff.

**D.    Conclusion**

Overall, the reasons for the primary jurisdiction doctrine are present in this case so that applying the doctrine will aid the purposes for which it was created.  Splitrock and Sprint argue that referral is not appropriate in this case because discovery has not begun and ask that the court delay referring any

22

issues to the FCC until the issues are crystallized through discovery. But the record before the court shows that the tariff application, classification of services, and reasonable rate issues should be referred to the FCC pursuant to the primary jurisdiction doctrine at this stage of the case. There is no need to wait for discovery to begin. "[I]f . . . the primary jurisdiction doctrine applies on any set of facts that could be developed by the parties, there is no reason to await discovery, summary judgment, or trial and the application of the doctrine properly may be determined on the pleadings." Davel Comm'cns, Inc. v. Qwest Corp., 460 F.3d 1075, 1089 (9th Cir. 2006).

Likewise, the court finds no merit to the parties' arguments that the FCC cannot provide a sufficient procedure to resolve the issues in this case. Splitrock suggests that the FCC cannot give each case individualized consideration. But the FCC is in a better position than the court to consider and understand the meaning of the technical issues and relevant facts in this case. See United States v. Great N. Ry. Co., 337 F.2d at 246 (noting that courts should avail themselves of the agency's superiority in gathering the relevant facts and in marshaling them into a meaningful pattern). Further, the court retains jurisdiction over the case and will have an opportunity to review the FCC's guidance on the referred issues and apply that guidance to the claims in this case. See Reiter v. Cooper, 507 U.S. 258, 268 (1993) ("Referral of the issue to the administrative agency does not deprive the court of

jurisdiction."). Referral of the issues described in this order does not deprive Splitrock of individualized consideration of its case.

Similarly, Sprint's argument that it would be more efficient for the parties to proceed with discovery in this court rather than before the FCC because the discovery rules are broader in federal court is unavailing. The expansiveness of the regulatory agency's discovery rules is not a consideration of the primary jurisdiction doctrine. See Access Telecomms., 137 F.3d at 608 (explaining that primary jurisdiction doctrine should be applied where issue calls for expert consideration and uniformity within the field of regulation). And, there is no indication that the parties would be unable to discover the relevant evidence pursuant to the FCC's discovery rules. The fact that the parties would prefer to develop their case in federal court does not defeat the application of the primary jurisdiction doctrine. "[T]he doctrine exists for the proper distribution of power between judicial and administrative bodies and not for the convenience of the parties." Red Lake Band of Chippewa Indians, 84 F.2d at 476.

The court has considered the added expense and delay that may result from the primary jurisdiction referral, but finds that the need for expert consideration, uniformity, and consistency within this complicated, technical, and dynamic field compels referral of specific issues to the FCC. The court agrees with the Southern District of New York that "[t]his area of telecommunication regulation is in dynamic flux . . . [so] these issues . . . are

24

ripe for determination and clarification by the regulatory agency." All Am. Tel. Co., 07 Civ. 861 (WHP), Docket 88 at 3 (citing Allnet Commc'n Servs., Inc. v. Nat'l Exchange Carrier Assoc., 965 F.2d 1118, 1121 (D.C. Cir. 1992)). Thus, the court will stay the case and order the parties to initiate the proper proceedings with the FCC.

## II.    Referral to the SDPUC

Sprint argues that if the court refers specific issues to the FCC, then the court should refer the analogous intrastate issues to the SDPUC, or alternatively, condition the stay on resolution of a proceeding currently pending before the SDPUC. See South Dakota Network, LLC v. Sprint Commc'ns Co., Docket TC-09-098 (S.D. Pub. Utils. Bd.).[10] Because the court instructed the parties to brief whether this action should be stayed pending referral of specific issues to the FCC only, Splitrock has not weighed in on whether referral to the SDPUC is also appropriate. Moreover, neither party has addressed whether a federal court may refer issues to a state agency, how the court should determine whether the primary jurisdiction doctrine applies with respect to a

---

[10] South Dakota Network, LLC (SDN) is a centralized equal access provider formed by many South Dakota LECs. SDN operates a tandem switch and provides centralized equal access services that allow IXCs to gain access to all of the LECs at a single point of connection. According to Sprint, SDN filed a complaint against Sprint with the SDPUC because Sprint refused to pay SDN's access charges for free calling provider traffic. Sprint then filed a third-party complaint against Splitrock, Northern Valley Communications, L.L.C., (Northern Valley) and Sancom, Inc. (Sancom). Sancom and Northern Valley filed cross-claims against Sprint.

state agency, and the proper procedure for a referral to the SDPUC.  Thus, the court cannot determine whether referral of intrastate issues to the SDPUC is appropriate at this time.  Similarly, the court cannot determine whether conditioning the stay of this case on resolution of the case currently pending before the SDPUC would satisfy any primary jurisdiction concerns with respect to the intrastate issues.  The court will consider referral of certain issues to the SDPUC upon proper motion by one of the parties.

Based on the foregoing, it is hereby

ORDERED that this action is STAYED pending (1) resolution of the dispute by agreement of the parties; (2) a decision on the disputed issues by the FCC pursuant to the referral described below; or (3) further order of the court.

IT IS FURTHER ORDERED that this matter is referred to the FCC for resolution, to the extent the FCC's jurisdiction permits, of the following issues:

(1)     Whether, under the facts of the present dispute between Splitrock and Sprint, Splitrock is entitled to collect interstate switched access charges it has billed to Sprint pursuant to Splitrock's interstate access tariff for calls to numbers assigned to free calling providers.

(2)     In the event that the services provided by Splitrock to Sprint, by which calls placed by Sprint's customers are delivered to free calling providers served by Splitrock, do not qualify as switched access service under Splitrock's applicable interstate access tariff, determination of the proper classification of these services, whether such services are subject to federal tariffing requirements, and whether Splitrock is entitled to obtain compensation for these services.

(3)    In the event that the services provided by Splitrock to Sprint do not qualify as switched access service under Splitrock's applicable interstate access tariff, but Splitrock is otherwise entitled to compensation for these services, determination of a reasonable rate for these services.

IT IS FURTHER ORDERED that Splitrock shall contact the Market Disputes Resolution Division of the FCC to obtain guidance regarding the appropriate method for bringing this matter before the FCC. Splitrock shall initiate proceedings as recommended by the Market Disputes Resolution Division within 30 days of the date of this order. Splitrock is directed to furnish the FCC with a copy of this order as part of its submission.

IT IS FURTHER ORDERED that the parties shall submit a joint report to the court every three months describing the status of the proceeding before the FCC, the first of which shall be filed no later than three months from the date of this order.

Dated March 30, 2010.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE